# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA, ex rel.;
MALISSA CUETO; and CHRISTINE PLATT;

     Plaintiffs,

v.

MEDICAL SERVICES OF AMERICA, INC.
d/b/a MEDI HOME HEALTH; and
TRADITIONAL HOME CARE, INC. d/b/a
MEDI HOME HEALTH AGENCY;

     Defendants.

_____/

CASE NO.:
FILED IN CAMERA

8:13cv 931 T27 TBM

## VERIFIED COMPLAINT UNDER THE QUI TAM PROVISIONS OF THE FALSE CLAIMS ACT

## INTRODUCTION

1.     This is an action brought by Relators, Malissa Cueto and Christine Platt, on behalf of the United States of America, to recover damages and civil penalties against Defendants, Medical Services of America, Inc., d/b/a Medi Home Health and Traditional Home Care, Inc. d/b/a Medi Home Health Agency (hereinafter collectively referred to as "Medi" or "Defendants"), pursuant to the Federal False Claims Act, Title 31 U.S.C. §§ 3729 et seq., ("FCA").

2.     Medi is a comprehensive home healthcare provider that offers home health care, hospice service, home medical equipment, diabetic supply, enteral nutrition, respiratory services, non-medical home care, personal emergency response, cardio diagnostics, home pharmacy/infusion therapy, and physician management. Medi has

Feldman Morgado, PA | 501 North Reo Street | Tampa | Florida | 33609 | PH (813) 639-9366

more than one-hundred (100) locations throughout the United States and abroad. See attached **Exhibit "A."**

3.     This action is based upon Medi's systematic conduct of submitting false Medicare billings to the United States government.

4.     The FCA provides that any person who submits a false claim to the government is liable for a civil penalty of between $5,500.00 and $11,000.00 for each such claim, and three times the amount of the damages sustained by the government. The Act permits persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery. Pursuant to 31 U.S.C. § 3730(b)(2), this complaint must be filed in *camera* and under seal for a minimum of sixty (60) days, without service on the Defendant. The complaint remains under seal while the government conducts an investigation of the allegations in the complaint and determines whether to join the action.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action pursuant to Title 31 U.S.C. §§ 3730(b) and 3732(a), which specifically confers jurisdiction on this Court for actions brought pursuant to The False Claims Act.

6.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. Defendants can be found in, reside in, or have transacted business in the Middle District of Florida.

7.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, reside in, or have transacted business in the Middle District of Florida, and many of the alleged acts occurred in this District.

8.     No allegation set forth in this Complaint is based on public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or General Accounting Office report, hearing audit, or investigation, or from the news media.

## THE PARTIES

9.     Relator, Malissa Cueto, is a resident of Hillsborough County, Florida. She was employed by Medi as an Account Executive from on or about July 15, 2009 through on or about July of 2012. See job description of Home Health Coordinator/Liason, a/k/a Account Executive, attached as **Exhibit "B."**

10.     Relator, Christine Platt, is a resident of Tom Green County, Texas. She was employed by Medi as a Regional Sales Manager from on or about June 29, 2009 through on or about June 23, 2010. Thereafter, Ms. Platt was employed as an Account Executive until her resignation was given on or about September 20, 2010. Medi is a Foreign Profit Corporation with its principal place of business located at 171 Monroe Lane, Lexington, South Carolina 29072.

11.     Medi is a comprehensive home healthcare provider that advertises the following services: medical equipment and supplies, home health services, hospice services, home infusion services, and home diabetes services, among other services. Medi has sixteen (16) home health service locations in the State of Florida and has locations in fourteen (14) states in addition to a location in the Philippines.

## LEGAL BACKGROUND

12.     The False Claims Act, 31 U.S.C. § 3729, provides, in pertinent part, that any person who:

Feldman Morgado, PA | 501 North Reo Street | Tampa | Florida | 33609 | PH (813) 639-9366

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(a)(1)(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); ... is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, ... plus 3 times the amount damages which the Government sustains because of the act of that person.

13.     The False Claims Act, 31 U.S.C. § 3729(b)(1)(A) further provides that:

*For purposes of the False Claims Act, the terms "knowing" and "knowingly" mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information, and (B) requires no proof of specific intent to defraud.*

## FACTUAL ALLEGATIONS

### Medicare

14.     Medicare is a federally funded social insurance program, administered by the U.S. federal government since 1965, that guarantees access to health insurance to eligible persons age 65 and over, and some disabled persons, and offers a variety of hospital, medical insurance and prescription drug benefits and is administered by the Centers for Medicare & Medicaid Services.

15.     As a social insurance program, Medicare spreads the risk associated with illness across society to protect everyone, and thus has a somewhat different social role from for-profit private insurers, which manage their risk portfolio to maximize profitability by denying coverage to those they anticipate will need it.

16.     Medicare offers all enrollees a defined benefit. Hospital care is covered under Part A and outpatient medical services are covered under Part B. To cover the Part

Feldman Morgado, PA | 501 North Reo Street | Tampa | Florida | 33609 | PH (813) 639-9366

A and Part B benefits, Medicare offers a choice between an open-network single payer health care plan (traditional Medicare) and a network plan (Medicare Advantage or Medicare Part C), where the federal government pays for private health coverage. A majority of Medicare enrollees have traditional Medicare (76%) over a Medicare Advantage plan (24%). Medicare Part D covers outpatient prescription drugs exclusively through private plans, either standalone prescription drug plans or through Medicare Advantage plans that offer prescription drugs.

17.     As part of its defined benefits, Medicare pays for certain health care services in a person's home if they meet certain eligibility criteria and if the services are considered reasonable and necessary for the treatment of an illness or injury. This is known as the Medicare home health benefit. See "Physician's Guide to Medicare Home Care" attached as **Exhibit "C."**

18.     To be able to use home health benefits under Medicare, a eligible person must:

(1)     Be under the care of a doctor and be getting services under a plan of care established and reviewed regularly by a doctor;

(2)     The doctor must certify that one or more of the following is needed:

(a)     Intermittent skilled nursing care;

(b)     Physical therapy;

(c)     Speech-language pathology services; or

(d)     Continued occupational therapy.

Feldman Morgado, PA | 501 North Reo Street | Tampa | Florida | 33609 | PH (813) 639-9366

(3)     The home health agency caring for the patient must be Medicare-certified; and

(4)     The patient must be homebound, and a doctor must certify that the patient is homebound.  Being homebound means that: (1) leaving the home is not recommended because of a condition; (2) a condition keeps the patient from leaving home without help (such as using a wheelchair or walker; needing special transportation; or getting help from another person); or (3) leaving home takes a considerable and taxing effort.

19.     As of November 17, 2010, CMS regulations mandated that, in order for Medicare to pay for Home Health Care, a physician and the patients they refer to home health care must have a "face to face encounter." See "Home Health Face-to-Face Physician/Practitioner Requirement Challenges" attached as **Exhibit "D."**

20.     The face to face encounter is intended to be a tool for reducing fraud, waste, and abuse by assuring that physicians or other healthcare providers have actually met with potential home health patients to ascertain their specific care needs.

21.     Reimbursement for Medicare claims is made by the United States through the Department of Health and Human Services ("HHS").  CMS is an agency of HHS and is directly responsible for the administration of the Medicare Program.  CMS, in turn, contracts with private insurance carriers to administer and pays claims from the Medicare Trust Fund.  In this capacity, the carriers act on behalf of CMS.  These entities are called fiscal intermediaries.  See **Exhibit "E"** for in-depth discussion of consolidated billing for home health care providers.

Feldman Morgado, PA | 501 North Reo Street | Tampa | Florida | 33609 | PH (813) 639-9366

22.     Health care providers participating in the Medicare Program are required to submit information to achieve settlement of costs relating to the health care services rendered to Medicare beneficiaries.  As such, Medicare enters into provider agreements with health care providers and any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

23.     As a prerequisite to payment, CMS requires health care providers to submit cost reports which are final claims that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

24.     Cost Report Certifications are a condition of payment under Medicare and whenever a cost report is submitted the provider certifies that:

> [T]he foregoing information is true, accurate, and complete.  I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State law.

25.     A claimant, such as Medi, who submits a CMS Cost Report also certifies that the services listed on the form were:

> "medically indicated and necessary for the health of the patient and were personally furnished by [the physician] or were furnished incident to [his or her] professional service by [his or her] employee ..." 31 U.S.C. § 3729(a).

26.     CMS also requires home health care providers to submit "Home Health Certification and Plan of Care" forms, known as Form CMS-485, in order to meet state and federal regulatory requirements for both the physician's home health plan of care and home health certification and recertification requirements.  See sample Form CMS-485 attached as **Exhibit "F."**

Feldman Morgado, PA | 501 North Reo Street | Tampa | Florida | 33609 | PH (813) 639-9366

## MEDICAL SERVICES OF AMERICA, INC., d/b/a MEDI HOME HEALTH & TRADITIONAL HOME CARE INC. d/b/a MEDI HOME HEALTH AGENCY ("Medi")

27. Medi is a "Home Health Agency" as that term is defined under Chapter 400 of the Florida Statutes.

28. Florida Statutes, §400.462(12) defines a "Home Health Agency" as an organization that provides home health services and staffing services.

29. Medi operates sixteen (16) locations in the State of Florida and operates facilities in fourteen (14) states throughout the United States and the Philippines and provides home health services and staffing services targeted to government-sponsored health care programs, such as Medicare.

30. During their employment with Medi, the Relators observed Medi engaging in and/or turning a blind eye to numerous fraudulent activities.

31. Medi made a conscious decision to dramatically increase revenues with the goal of reaping immediate, substantial financial reward through a systematic and widespread scheme to contravene CMS regulations, as well as federal and state laws, in order to submit fraudulent claims to the U.S. government under its Medicare Programs.

## MEDI VIOLATED THE ANTI-KICKBACK STATUTE, 42 U.S.C. § 1320–7a(b), AND THE STARK LAW, 42 U.S.C. § 1395nn, BY PAYING PHYSICIANS FOR REFERRALS

32. In light of the concern that decisions of health care providers can be improperly influenced by a profit motive, and in order to protect federal health care programs from additional costs and overutilization, Congress enacted the anti-kickback statute as codified in 42 U.S.C. § 1320–7a(b) of the Social Security Act. See "Guidance on the Federal Anti-Kickback Law" attached as **Exhibit "G."**

33.    The anti-kickback statute makes it illegal for a person to knowingly and willfully offer, pay, solicit, or receive anything of value (i.e., "remuneration") in return for a referral or to induce generation of business reimbursable under a federal health care program.

34.    The statute prohibits both the offer or payment of remuneration for patient referrals, as well as the offer or payment of anything of value in return for purchasing, leasing, ordering, or arranging for, or recommending the purchase, lease, or ordering of any item or service that is reimbursable by a federal health care program.

35.    Section 6402(f) of the Patient Protection and Affordable Care Act ("PPACA") revised the evidentiary standard under the anti-kickback statute and states that in order to establish a violation of Section 1128B of the Social Security Act, including the anti-kickback statute, a defendant does not have to have actual knowledge of, or specific intent to commit a violation of, the anti-kickback statute.

36.    Limitations on physician self-referrals were enacted into law in 1989 under the Ethics in Patient Referrals Act, commonly referred to as the "Stark Law," created as Section 1877 of the Social Security Act and codified at 42 U.S.C. § 1395nn.

37.    The Stark Law prohibits physician referrals of designated health services that may be paid by Medicare patients to entities if the physician has a financial relationship with that entity.

38.    The Stark Law provides that if (1) a physician (or an immediate family member of a physician) has a "financial relationship" with an entity, the physician may not make a referral to the entity for the furnishing of designated health services for which payment may be made under Medicare and (2) the entity may not present (or cause to be

Feldman Morgado, PA | 501 North Reo Street | Tampa | Florida | 33609 | PH (813) 639-9366

presented) a claim to the federal health care program or bill to any individual or entity for DHS furnished pursuant to a prohibited referral.

39.     The purpose behind the Stark Law is to prevent physicians from making referrals based on financial gain, thus preventing utilization and increased health care costs.

40.     During their employment with Medi, Relators became aware of a pervasive pattern of kickbacks and pay for referrals abuses between Medi and physicians who referred patients for Medi's home health services. See an email from a former account representative of Medi, Tara Reedy, to Relator, Ms. Platt attached as **Exhibit "H."**

41.     As part of its business model, Medi relies on patient referrals from physicians to obtain patients for its home health agency services.

42.     In order to facilitate referrals, Medi hires marketing representatives, including Relators, to promote and market Medi's services by visiting with physicians to obtain direct referrals to Medi.

43.     However, to continue facilitating referrals from physicians, Medi enters into contractual arrangements with certain physician and employs them as Medical Directors and/or Outcome Based Quality Improvement Physicians ("OBQI"). The OBQI reviews out of state charts on patients coming to Medi from out of state. An OBQI is given 4 charts a month and receives $250.00 per chart. Medi requires 8-10 referrals in exchange. Medical directors hired by Medi receive a flat fee of $2,000.00 per month in return for providing Medi with at least 10 referrals. See contract between Medi and OBQI physicians attached as **Exhibit "I."**

Feldman Morgado, PA | 501 North Reo Street | Tampa | Florida | 33609 | PH (813) 639-9366

44. Each of Medi's Medical Directors has a vested financial interest in providing Medi with patient referrals. Each Medical Director/OBQI was also paid by Medicare by signing a Form-CMS 485 in addition to receiving compensation from Medi.

45. One of Medi's Medical Directors, Dr. Albert Tawil, has a contractual agreement to be compensated by Medi for referrals and is told that if he fails to provide enough referrals Medi will cease compensating him as a Medical Director.

46. Medi's contractual arrangements with its Medical Directors is a sham as the intent and purpose of Medi's contracts with its Medical Directors is to provide for direct referrals and compensation for the referrals in direct contravention of the Stark Law. See email correspondence from Kimberly Rosenberg directing Medi's Account Executives to push Polk County Medical Director, Dr. Widick, to refer more business to Medi attached as **Exhibit "J."**

47. Each of Medi's Medical Directors in each location are commanded by Medi to refer a minimum number of patients to Medi every month in order to maintain the contractual relationships between Medi and its Medical Directors. See "Patient Census – Consolidated" for Medi's Tampa Regional Office attached as **Exhibit "K."**

48. If Medi's Medical Directors/OBQI fail to provide Medi with the minimum number of referrals every month then Medi will terminate the contractual relationship with its Medical Directors/OBQI and thereby cease to compensate them. As such, the compensation paid to the Medical Directors/OBQI is directly tied to producing a quota of direct referrals, and vice versa, the referrals provide the basis for compensation of the Medical Directors/OBQI.

Feldman Morgado, PA | 501 North Reo Street | Tampa | Florida | 33609 | PH (813) 639-9366

49.     For example, Dr. Stephen G Swengros, a Medical Director who worked out of Medi's Polk County offices, was terminated when he failed to send referrals to Medi.

50.     During her employment with Medi, Relator, Malissa Cueto, was assigned to Dr. Tawil's office as a point of contact. However, Ms. Cueto was instructed to terminate her relationship between Medi and Dr. Tawil because Ms. Rosenberg stated that Dr. Tawil was loyal to Medi and would refer patients regardless of whether Ms. Cueto was assigned to him. Ms. Rosenberg explained that as a Medical Director Dr. Tawil had an incentive to refer patients to Medi because he was compensated based on the number of referrals he provided to Medi. See email correspondence between Ms. Cueto and Ms. Rosenberg attached as **Exhibit "L."**

51.     Medi requires its Account Executive/marketing representatives to maintain a referral quota from their individual territories. Each marketing representative was required to convince physicians to refer at least 20 patients per month to Medi for home health services.

52.     In order to entice a physician to make direct referrals to Medi, Medi's administrator for each branch would offer positions as Medical Directors and/or OBQI whereby the physicians were given lucrative contractual relationships in which the physicians are paid by Medi for their referrals. Once under contract, each physician would typically refer at minimum 8 patients per month.

53.     Medi's Branch Manager, Carol Caltagirone, communicated to physicians that Medi would pay the Medical Directors based upon the number of referrals sent to Medi, in lieu of the hours each Medical Director actually worked and refused to

Feldman Morgado, PA | 501 North Reo Street | Tampa | Florida | 33609 | PH (813) 639-9366

compensate physicians with low referrals the hourly fees owed to them under the terms of the contracts.

54.     By engaging in these unlawful activities, Medi is responsible for increasing health care costs and violating the anti-kickback statute and the Stark law exposing it to civil penalties and exclusion from participation in Medicare programs as well as presenting claims that it "knows or should know" violates the statute in violation of the FCA.

**MEDI VIOLATED CMS REGULATIONS FOR REQUIREMENTS**
**OF FACE TO FACE ENCOUNTERS BETWEEN PHYSICIANS**
**AND PATIENTS REFERRED TO HOME HEALTH CARE**

55.     On April 1, 2011, CMS began requiring documentation of a face to face encounter between a physician and the patients they refer to home health care. See "Face-to-Face Overview" attached as **Exhibit "M."**

56.     In order to comply with CMS's regulation, each physician is required to complete a Face to Face Encounter form which sets forth the medical necessity and basis for the home healthcare referral.

57.     Among the information that the physician must certify is that the patient's condition makes them homebound, as required by CMS Chapter 7 of the Medicare Benefits Manual 30.1.1, and that the patient's condition necessitates intermittent nursing, physical therapy, or speech language pathology as required by CMS Chapter 7 of the Medicare Benefits Manual 30.4. The physician is also required to fill out and sign the prescription for each patient.

58.     Relators have uncovered that the forms certifying that a face to face encounter was performed contained mere rubber stamps versus the actual required

Feldman Morgado, PA | 501 North Reo Street | Tampa | Florida | 33609 | PH (813) 639-9366

signature of the physician as required by CMS's Medicare Program Integrity Manual, Chapter 3, Section 3.3.2.4.

59. Medi also directed physicians what to write on their documentation of face to face encounter forms. Medi faxed documents to physicians which specifically stated what the physician was supposed to write on their face to face documentation forms including, but not limited to, the reason the patient is unable to leave their home. See facsimile from Medi to Dr. Tawil instructing Dr. Tawil on how to complete the Face-to-Face Form attached as **Exhibit "N."**

60. Medi also sent communications to staff members at Dr. Tawil's office instructing them on how to complete the Face-to-Face forms to justify the home health care services they provided and were paid for by Medicare. See facsimile from Medi to Dr. Tawil's office instructing Dr. Tawil's office staff on how to complete the Face-to-Face Form attached as **Exhibit "O."**

## MEDI ENGAGED IN UPCODING AND OVERUTILIZATION VIOLATIONS RESULTING IN UNNECESSARY INCREASED HEALTH CARE COSTS PAID FOR BY MEDICARE

61. Upcoding refers to a provider's use of Current Procedural Terminology (CPT) codes to bill health insurance payers, such as Medicare. See "Home Health Fraud" article attached as **Exhibit "P."**

62. Upcoding occurs when a provider intentionally uses a higher-paying code on the claim form for a patient to fraudulently reflect the use of a more expensive procedure or device that was actually used or was necessary.

63. Medi's systematic and pervasive use of upcoding resulted in large and fraudulently obtained profits paid for by Medicare.

64.     Relators have uncovered frequent use of Medi's practices of upcoding. By example, a patient of Medi, Joan Cook, was ordered by Dr. Tawil to receive skilled nursing services. However, Medi ordered and added additional, unnecessary services for Ms. Cook including seven (7) visits for physical therapy resulting in unnecessary expenses billed to Medicare. See medical records of patient Joan Cook attached as **Exhibit "Q."**

65.     Dr. Tawil also discharged Ms. Cook from a competitor of Medi so that she could be referred to Medi. Although patients have a choice of which homecare provider to use and Ms. Cook had no choice in choosing Medi. Nonetheless, Dr. Tawil was compensated by Medi so that he could get his quota kickback. See discharge form from Dr. Tawil attached as **Exhibit "R."**

66.     Medi also required its registered nurses to complete Form CMS-485, the Home Health Certification and Plan of Care, with fraudulently upcoded procedures in order to present them to its referring physicians for signatures.

67.     In such instances, Medi's referring physicians, such as Dr. Tawil, faxed the CMS-485 Form to sign without reading it or cross referencing it to the physician's original prescription which would have revealed the upcoding practices.

68.     In another example of fraudulent billing, Dr. Tawil referred a patient to Medi who had a cough and congestion. Nonetheless, Medi fraudulently upcoded the patient's diagnosis to include, but not limited to, Parkinson's Disease, COPD, hypertension, and hypothyroidism. See medical records of Ignazio Villarosa attached as **Exhibit "S."**

Feldman Morgado, PA | 501 North Reo Street | Tampa | Florida | 33609 | PH (813) 639-9366

69.     Celia Williams, an administrator, altered Dr. Tawil's plan of care treatments in May of 2012 and applied the changes retroactively to March of 2012. Nonetheless, the modification of the treatment plan was not presented to Dr. Tawil for several months after treatment and services were rendered by Medi. See medical records of Josephine Leto and Alexander Kreher attached as Exhibits "T" and "U," respectively, as well as "Physician's Plan of Treatment – Change and Additional Orders" attached as **Exhibit "V."**

70.     Ms. Williams also cut costs by instructing her employees on how to have referral and initial orders written. See email correspondence from Celia Williams to her subordinates instructing them how to complete a referral or initial order form attached as **Exhibit "W."**

71.     Although Celia Williams is a licensed RN she has never had her skills reassessed.

72.     In one especially disturbing example of fraudulent billing, Dr. Tawil referred a patient to Medi, James Fleming, whom Medi knew was not an appropriate candidate for home health services but rather needed hospice care. Nonetheless, Medi accepted the referral, provided home health services, and the patient died while receiving home health care. See medical records of James Fleming attached as **Exhibit "X."**

## MEDI HIRED HEALTH CARE WORKERS WITH CRIMINAL BACKGROUNDS IN VIOLATION OF CMS REGULATIONS AND FLORIDA LAW

73.     As a "home health agency" Medi is subject to Chapter 400 of the Florida Statutes.

Feldman Morgado, PA | 501 North Reo Street | Tampa | Florida | 33609 | PH (813) 639-9366

74. Florida Statutes, Section 400.512 requires home health agency personnel to have level 2 background screening.

75. Medi failed to conduct level 2 background screening on its employees. See arrest records and related articles of employees hired by Medi with criminal records attached as **Exhibit "Y."**

76. Level 2 screening requires the job candidate's name, address, social security number, birth date, and other information to perform an employment history and education background check. The job candidate must also complete a fingerprint card, which is sent to the Federal Bureau of Investigation and the Florida Department of Law Enforcement for analysis against state and national offender databases.

77. Medi failed to conduct and/or did not conduct a sufficient level II screening of its employees which resulted in employees, such as Angela Michelle Helms and Roy Antigua, with criminal backgrounds to be hired by Medi putting countless patients at risk.

### MEDI VIOLATED THE CMS "MEDICARE PROGRAM INTEGRITY MANUAL" CHAPTER 3, SECTION 3.3.2.4 BY ALLOWING REFERRING PHYSICIANS TO USE SIGNATURE STAMPS

78. CMS's Medicare Program Integrity Manual, Chapter 3, Section 3.3.2.4 "requires that services provided/ordered be authenticated by the author. The method used shall be a handwritten or electronic signature. Stamped signatures are not acceptable."

79. Medi violated Medicare's policy of banning the use of physician signature stamps by allowing its referring physicians, including Dr. Tawil, to use

Feldman Morgado, PA | 501 North Reo Street | Tampa | Florida | 33609 | PH (813) 639-9366

signature stamps on prescriptions and other documentation such as CMS-485 Forms. See example of stamped signature by Dr. Tawil attached as **Exhibit "Z."**

80.     The preceding examples are just a few of the examples the Relators have documented that show a systematic and deliberate policy enacted by Medi resulting in untold millions of dollars that have been retained by Medi that rightfully belong to the Government under the Medicare Program.

81.     Relators complained about the aforementioned policies and practices and informed their supervisors, including Medi's Human Resources Department, about Medi's illegal activities.    However, Medi continued to allow and encourage such practices to continue at the expense of the Government.  See email correspondence from Relator, Malissa Cueto, to Sandra Callendar, Employee Relations Manager, discussing Medi's violations attached as **Exhibit "A-1."**

82.     As to each of the factual allegations, Medi acted with actual knowledge of this information, in deliberate ignorance of the truth or falsity of this information and/or in reckless disregard of the truth or falsity of this information.  Medi knowingly violated the False Claims Act as that term is defined in 31 U.S.C. § 3729(b).

83.     Pursuant to Section 6402 of The Patient Protection and Affordable Care Act ("PPACA"), Defendant owed an obligation to report and return any overpayments within 60 days after either the date on which the overpayment was identified or the date any corresponding cost report was due, whichever is later.

84.     By retaining overpayments longer than sixty (60) days and not remitting moneys owed to the Government, Defendants have violated the False Claims Act.

Feldman Morgado, PA | 501 North Reo Street | Tampa | Florida | 33609 | PH (813) 639-9366

85. The Government has suffered actual monetary damage as a result of Defendants' fraudulent activities described above.

## COUNT I
## VIOLATION OF FALSE CLAIMS ACT
## 31 U.S.C. § 3729 (FCA)

86. Relators reallege and incorporate by reference the allegations of paragraphs 12-84 of this Complaint.

87. The False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), imposes liability, *inter alia*, those who knowingly cause to be presented to an officer or employee of the United States false claims for payment or approval. It also imposes liability on those who conspire to get false claims paid. 31 U.S.C. § 3729(a)(3).

88. Defendants deliberately engaged in a concerted effort to retain overpayments made by the Government under the Medicare Programs and failing to remit moneys owed to the Government.

89. Claims for payment to federally-financed healthcare systems, to include at least Medicare, were false claims.

90. Defendants have knowingly violated:

(a) 31 U.S.C. § 3729(a)(1) by knowingly presenting, or causing to be presented, to an officer or employee of the United States Government or member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(b) 31 U.S.C. § 3729(a)(2) by knowingly making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

Feldman Morgado, PA | 501 North Reo Street | Tampa | Florida | 33609 | PH (813) 639-9366

(c)  31 U.S.C. § 3729(a)(3) by conspiring to defraud the Government by getting a false or fraudulent claim allowed or paid; and/or

(d)  31. U.S.C. § 3729(a)(7) by knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

91.  By reason of Defendants' fraudulent activities, the United States has been damaged, and continues to be damaged.

## PRAYER FOR RELIEF

WHEREFORE, Relators request that judgment be entered against Defendants, ordering that:

A.  Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty against Defendant of not less than $5,500.00, and not more than $11,000.00 for each violation of 31 U.S.C. § 3729;

B.  Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

C.  Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq*;

D.  Relators be awarded all costs of this action, including attorney's fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d) and (h); and,

E.  The United States and Relators be granted all such other relief as the Court deems just and proper.

Feldman Morgado, PA | 501 North Reo Street | Tampa | Florida | 33609 | PH (813) 639-9366

## DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury on all questions of fact raised by this Complaint.

Dated: _April 5 2013_

MITCHELL L. FELDMAN
Florida Bar No.: 80349
mfeldman@ffmlawgroup.com
FELDMAN MORGADO, PA
501 North Reo Street
Tampa, Florida 33609
Tele: (813) 639-9366
Fax: (813) 639-9376
Attorney for the Relators

## VERIFICATIONS

I, <u>Malissa Cueto</u>, have reviewed the foregoing Complaint and swear under the penalties of perjury that the facts as alleged are true and correct to the best of my knowledge and belief.

Malissa Cueto                     2-26-2013
Malissa Cueto            Date

I, <u>Christine Platt</u>, have reviewed the foregoing Complaint and swear under the penalties of perjury that the facts as alleged are true and correct to the best of my knowledge and belief.

Christine Platt                    2-28-2013
Christine Platt            Date